RICHARD H. CRAWFORD, SUBSTITUTED FOR JOHN GONYEA AS SPECIAL ADMINISTRATOR OF ESTATE OF JOHN LAWRENCE GONYEA, v. DULUTH, MISSABE AND IRON RANGE RAILWAY COMPANY.[1]

June 15, 1945.

No. 34,072.

[1]Reported in 19 N. W. (2d) 384.

*James J. Courtney* and *Beldin H. Loftsgaarden,* for appellant.
*Dennis F. Donovan,* for respondent.

PETERSON, JUSTICE.

This action was brought by the special administrator of John Lawrence Gonyea under the federal employers liability act (45 USCA, § 51, *et seq.*) to recover for his wrongful death, alleged to have been caused by defendant's negligence. The defenses principally relied on were that decedent was employed at the time his death occurred by one Joseph D. Harrold, an independent contractor, to whom he had been loaned; that defendant was not guilty of negligence; and that decedent was guilty of contributory negligence and assumption of risk. Apparently assumption of risk is out of the case. If it is not, it should be, because the last vestige of that doctrine was obliterated by the 1939 amendment of the act (45 USCA, § 54) abolishing the defense of assumption of risk where death of or injury to an employe of an interstate common carrier results in whole or in part from the negligence of such carrier. Tiller v. Atlantic Coast Line R. Co. 318 U. S. 54, 63 S. Ct. 444, 87 L. ed. 610, 143 A. L. R. 967; Lilly v. Grand Trunk Western R. Co. 317 U. S. 481, 63 S. Ct. 347, 87 L. ed. 411.

Here, as below, plaintiff contends that the evidence conclusively shows that decedent was not loaned as a servant to Harrold, because he had never been advised of any change of employers; that as a matter of law Harrold was not an independent contractor; that, because as a matter of law decedent was not a loaned servant and Harrold was not an independent contractor, it was error to submit those issues to the jury; and that the trial court erred in numerous respects in rulings on the admissibility of evidence and in the instructions. Defendant contends that it appears as a matter of law that it was free of negligence and that the decedent was

guilty of such contributory negligence as to prevent a recovery for his death.

For some time prior to his death the decedent was employed by defendant in connection with unloading iron ore from its trains to boats moored at its docks in Duluth. The railroad tracks approach the docks from the north over a steel trestle about 70 feet high. There are two tracks, called the east and west tracks. The rails for each track are laid on separate ties, which are attached to the trestle. There is a space of about two feet between the ends of the ties of the separate tracks. This space was covered with boards on which the men walked. It was known as a catwalk. Early in the morning of October 5, 1943, a fire burned more than 500 feet of the ties and catwalk. The extent of the damage does not clearly appear, except that the ties, which normally had square edges, were badly burned so that they were rounded and part of the catwalk was totally destroyed. At any rate, it was necessary to lay new ties, attach them to the trestle, spike the rails to the ties, and rebuild the catwalk. At daybreak the work began.

A contractor by the name of Harrold was employed to do the work other than laying the rails. It was not shown definitely just what work he was to do. If he had a written contract, that fact does not appear. The terms of the contract, whether written or oral, were not shown. The west track was repaired first. The burned ties and timbers were removed. Except for a short space, new ties were put in place during the day. Meanwhile, the burned ties for the east track remained in place.

At about eight o'clock on the evening of October 6, one of defendant's foremen requested decedent and some other workmen employed in unloading iron ore at the dock to go to the trestle and work there in connection with the repairs being made. He was not told that he was to work for Harrold; there was nothing said about any change of employers. When decedent got over to the trestle, defendant's foremen and bosses were there supervising the work and giving orders. Harrold was not there; he testified that he was out of town at the time. He had a foreman or straw boss

on the job, but what he did does not appear, except that he "jumped" on another workman. Notwithstanding the presence of Harrold's foreman, defendant's foremen and bosses told the men what to do and supervised the work in all details. Defendant's chief engineer testified that he was present supervising and coördinating the work, and that he had "general supervision over the work, either Contractor Harrold's work or anybody's." The testimony showed that he and defendant's other representatives supervised the job in every detail. The materials used on the job were furnished by defendant out of stock kept at nearby Proctor. Among other things, defendant furnished electric-light equipment and current to light the place for nightwork.

From this point forward, the evidence is in direct conflict on every point. Plaintiff's evidence was to the effect that decedent and the other men from the ore dock first unloaded a carload of ties; that then they carried what are called "tie plates," which are heavy steel plates used in attaching rails to ties, from the place on the trestle where they were piled to other workmen engaged in attaching the rails to the ties; that defendant gave no instructions as to the manner of doing this work; that the men engaged in doing the work adopted their own plan, consisting of carrying the plates down the west track, depositing them where they were to be used, stepping across from the ends of the ties of the west track to the burned ones still in place on the east track, and then walking back on the east track to get more plates. The plates were carried to the points farthest from the place where they were piled. As the work progressed the distance became shorter, with the consequence that the men stepped across from the west to the east track at points progressively closer to the piles. Thus, each crossing place was a different one. The space between the ends of the ties of the two tracks was open where the plates were deposited, because the old catwalk had been burned and a new one had not yet been built. Defendant's foremen and bosses walked and stood on the east track where the men crossed.

Defendant's evidence was to the effect that the men were instructed to walk back and forth on the west track and to keep between its rails. Plaintiff claimed that this was impracticable, because of the presence of spikers and other workmen there. Apparently defendant, through its representatives on the job, repeatedly warned the workmen to be careful, but it does not appear that they warned them against any particular dangers.

Plaintiff's evidence was that decedent came to his death by falling through the open space between the east and west tracks to the ground about 70 feet below while engaged in stepping across the space from the west track to the east one after depositing some plates. There were seven eyewitnesses to the fact of decedent's falling, but only one, Clarence W. Johnson, saw him stepping across and knew what happened just before he fell. He testified that when decedent got his weight on one of the burned ties of the east track there was a cracking noise; that decedent's foot slipped; and that he fell to the ground below.

The evidence was in dispute as to whether the place where the decedent fell through was properly lighted. Plaintiff's evidence showed that the closest lamp was about 20 feet distant and that the light there "was not so good." This was disputed by defendant.

The workmen who were transferred from the ore dock to the trestle were paid by Harrold, even though some of them had as little as only one and a half hour's pay coming. None of them, including decedent, were informed at the time of the transfer that Harrold was to pay them. Some time after the fatal accident, Harrold had a payroll made up, which was sent down to defendant's men for signature. Numerous errors are assigned on the admission of the payroll in evidence.

■ The relation of master and servant is a contractual one. The contract may be express or implied, but there must be a contract in order to create the relationship. Dahl v. Wunderlich, 194 Minn. 35, 259 N. W. 399. A new master cannot be foisted upon a servant unwittingly. The right to select one's employer is implicit in freedom from involuntary servitude. An employer may loan his em-

ploye to another so that for the time being the employe becomes the servant of the latter, but this can be done only with the employe's assent. Melhus v. Sam Johnson & Sons Fisheries Co. Inc. 188 Minn. 304, 247 N. W. 2. Where a change of masters is claimed by the employer, the burden is upon him to show that the alleged change was made with the servant's assent. Benson v. Lehigh Valley Coal Co. 124 Minn. 222, 144 N. W. 774, 50 L.R.A.(N.S.) 170. Here, there was no evidence to show that decedent was loaned to Harrold with his assent. There is no claim of an express assent. The evidence does not permit a finding of one by inference. When decedent got over to the trestle he saw defendant's foremen and bosses in charge of the work. He, the same as the other workmen, continued to be subject to their control and direction. There is no evidence that he ever submitted to the control and direction of Harrold, or his so-called straw boss, who was there. True, it appears that the straw boss "jumped" on a workman, but it does not appear that he ever assumed control and direction of the work. The payroll which Harrold prepared and had the men sign after decedent's death was no evidence that decedent assented to any employment of him by Harrold. It was evidence for what it was worth against the workmen who signed it that they had assented to a change of employers, but not against plaintiff. The evidence compels a finding that there was no change of employers. Tuttle v. Farmer's Handy Wagon Co. 124 Minn. 204, 144 N. W. 938. Consequently, as a matter of law, decedent was defendant's employe at the time, and it was error to submit to the jury the question whether he was employed by Harrold.

■ The master owes the servant the duty of exercising reasonable care to furnish a safe place to work. The duty of furnishing a safe place to work includes that of furnishing light when necessary to make the place where the work is being done reasonably safe. This duty commonly arises where the work is being done at night, and the failure to provide light unreasonably exposes the servant to danger of harm. Where the duty is undertaken by the master, he is liable for injuries to the servant proximately result-

ing from defective lighting. Carlson v. G. N. Ry. Co. 106 Minn. 254, 118 N. W. 832; Forseth v. Iron River Lbr. Co. 142 Wis. 87, 124 N. W. 1036; 3 LaBatt, Master and Servant (2 ed.) § 1005; 39 C. J., Master and Servant, § 469. In Bruns v. Northern Iowa Brick & Tile Co. 152 Iowa 61, 67, 130 N. W. 1083, 1085, the court said:

"If conditions existed at the time plaintiff went to work about the overhanging clay which created the danger, or if they afterwards arose, and such conditions and danger would ordinarily be discovered with reasonably sufficient light, the failure to furnish such light might be the proximate cause of the injury."

The rule is applicable in connection with construction work, where it is feasible to furnish light. In Bausert v. Thompson-Starrett Co. 126 App. Div. 332, 110 N. Y. S. 521, it was held that a master engaged in the construction of a large building owes his employes the duty of lighting the place so as to enable them to observe dangers.

The case of Boyle v. Degnon-McLean Const. Co. 47 App. Div. 311, 61 N. Y. S. 1043 (appeal dismissed, 163 N. Y. 591, 57 N. E. 1104), is similar to the one at bar. There, Mr. Justice Willard Bartlett, later Chief Judge of the Court of Appeals, speaking for the court, said (47 App. Div. 312, 61 N. Y. S. 1043):

"There is no difficulty whatever in sustaining the finding that the defendant corporation was negligent. It provided its servant with a place in which to do his work, which was not merely unsafe, but which was extremely dangerous. This was an elevated trestle, in the upper surface of which was a hole about seven feet long by four feet in width, and distant not more than seven feet from that portion of the structure upon which the deceased was engaged in loading lumber on a car. The existence of such an aperture through which a fall might prove fatal (as it actually did in the case at bar), was a peril to which the defendant could not properly expose its servants at night in the absence of light sufficient to disclose its presence."

Cases like Bimberg v. N. P. Ry. Co. 217 Minn. 187, 14 N. W. (2d) 410 (*certiorari* denied, 323 U. S. 752, 65 S. Ct. 87, 89 L. ed. —) ; and Hanson v. G. N. Ry. Co. 128 Minn. 122, 150 N. W. 380 (affirmed, 242 U. S. 615, 37 S. Ct. 211, 61 L. ed. 529), are not particularly in point, except insofar as both hold that the master owes the servant a duty to furnish a safe place to work. Both involved injuries to workmen occurring while working on railroad trestles, but neither involved the question of the master's duty to provide light while doing work at night. In the Bimberg case, we held that a railroad may be found guilty of negligence for failure to provide guardrails, safety belts, or other safety devices to protect a bridge carpenter working on a trestle. In the Hanson case, we held that a railroad could not reasonably be required to cover with flooring a triangular space in the ironwork of a bridge projecting over the parapet thereof and an adjacent open space above the ground below so as to protect workmen from falling who stood on the parapet while working and braced themselves by putting a foot against the ironwork above the open space, and that the railroad was not negligent for failing to install such flooring. We said that the place where the work was done (128 Minn. 124-125, 150 N. W. 381) "was dangerous in no different way than is any place so high above solid earth that a false step or loss of balance may mean death or serious injury," and that "the danger in this case was inherent in the nature of the work, and we are not able to perceive how defendant could have removed or lessened this danger by any precaution it could take."

Here, the situation was different. It was defendant's duty, because of the great and unusual danger incident to the work, to use all appliances reasonably attainable to prevent accidents. Mather v. Rillston, 156 U. S. 391, 15 S. Ct. 464, 39 L. ed. 464; 2 Shearman and Redfield, Negligence (Rev. ed.) § 197. Here, defendant, unlike the defendant in the Hanson case, was able by taking reasonable precaution to prevent accidents by providing proper light. This duty it recognized and attempted to discharge, but in such a negligent manner that the light furnished was inade-

quate. If adequate light had been furnished, decedent might have been able to observe the defects, if any, in the tie on which he slipped, causing him to fall. See, Bruns v. Northern Iowa Brick & Tile Co. 152 Iowa 61, 130 N. W. 1083, *supra*. Because there is evidence to show that defendant furnished inadequate light and that the failure properly to light might have been the cause of decedent's failure to observe the condition of the tie on which he stepped, defendant's negligence was a fact question for the jury.

■ Whether decedent was guilty of contributory negligence and to what extent, if any, were, under the circumstances, fact questions. Boyle v. Degnon-McLean Const. Co. 47 App. Div. 311, 61 N. Y. S. 1043, *supra*.

■ The verdict was a general one. Where several issues are submitted to the jury and a general verdict returned, and a finding in favor of the prevailing party on one of the issues is not sustained by the evidence, there must be a new trial. Cavallero v. Travelers Ins. Co. 197 Minn. 417, 267 N. W. 370. Because the issue whether decedent was Harrold's servant at the time of his death was submitted to the jury and there was no evidence to sustain a finding that he was, the instant case comes within that rule. Hence a new trial must be granted.

We have not discussed some questions such as the admissibility of certain evidence to show that defendant loaned decedent as a servant to Harrold so as to become the latter's servant for the time and that Harrold was an independent contractor. The former is not likely to arise on retrial; the latter is not necessary to decision here.

Reversed and new trial granted.